**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **THOMAS GRECO** | : | |
| **Plaintiff,** | : | **CIVIL ACTION NO. 3:12-2576** |
| **v.** | : | **(JUDGE MANNION)** |
| **MICHAEL SENCHAK, et al.** | : | |
| **Defendants.** | : | |

## MEMORANDUM

Pending before the court are two motions to dismiss, one filed by defendant Point and Pay LLC, (Doc. No. 2), and one filed by defendants Rodgers, Shamany, Northeast Revenue Services LLC and Luzerne County. (Doc. No. 16.) Point and Pay's sole ground for dismissal is that it did not owe plaintiff a duty. (Doc. No. 18.) Defendants Luzerne County, Northeast Revenue, Rodgers, and Shamany move to dismiss the complaint on the grounds that the negligence claim is barred by the statute of limitations and the tortious misfeasance and malfeasance claims are not recognized torts. (Doc. No. 4, at 5-7.) They also argue that the equal protection claim should be dismissed because plaintiff failed to identify similarly situated individuals that were treated differently, failed to allege that defendants intentionally discriminated, failed to allege defendants lacked a rational basis for their actions, and failed to point to a law that was enforced selectively. (Doc. No.

4, at 7-14.) Finally, defendants Rodgers and Shamany claim that they are immune from suit, and Luzerne County claims that municipal liability is not supported by plaintiff's allegations. (Doc. No. 4, at 14-20.) In light of the following, the motion to dismiss will be **GRANTED IN PART** and **DENIED IN PART**. The court will also **GRANT** plaintiff **LEAVE TO AMEND** his complaint with regard to several of his claims.

## BACKGROUND

This dispute began when an employee of the Luzerne County Tax Claim Office notified plaintiff's bookkeeper, Mary Tencza, that plaintiff owed back taxes on several of his properties. (Doc. No. 1, at 3.) On August 2, 2010, plaintiff sent Ms. Tencza to the Tax Claim Office to pay the delinquent taxes, but she was informed that the amount due was less than originally stated. (Doc. No. 1, at 3.) Despite the confusion, she payed the total revised amount that same day as represented to her by the employee. (Doc. No. 1, at 3.)

While the complaint is unclear, it appears that plaintiff subsequently called the county to inquire why the delinquent tax amount was lower than the amount originally disclosed. (Doc. No. 1, at 3.) An employee informed him that the county had already received several online payments for plaintiff's properties before the date on which Ms. Tencza paid the residual amount,

thereby reducing plaintiff's remaining liability. (Doc. No. 1, at 3-4.) Plaintiff denied making any prior payments and requested more information about the payments, but the clerk advised him that the information could not be divulged. (Doc. No. 1, at 4.) Plaintiff asked the clerk if he could pay the total original amount of taxes due, including the taxes allegedly already paid, but the clerk said the computer would not allow him to pay more than he owed. (Doc. No. 1, at 4.)

Several days later, on August 12, 2010, plaintiff was listening to a local radio station when the radio host began "ridiculing [him] and questioning his financial stature as a result of a newspaper article on August 12, 2010, in the Wilkes-Barre Times Leader." (Doc. No. 1, at 4.) Plaintiff purchased the paper and discovered that it contained an article about him, saying that he had bounced six electronic checks totaling $41,911 as payment for real estate taxes. (Doc. No. 1, at 4.) Plaintiff claims that the newspaper received the false information from an employee of the Tax Claims Office, but plaintiff does not propose a motive or provide an explanation why the employee contacted the paper. (Doc. No. 1, at 6.) Plaintiff also claims that five or six other taxpayers bounced checks during the same period, but he was the only one about which Luzerne County contacted the press. (Doc. No. 1, at 6.)

Outraged by the Times Leader article and puzzled by the anonymous checks in his name, plaintiff contacted the U.S. Secret Service to request an investigation into the incident. (Doc. No. 1, at 6.) He also instructed Ms. Tencza to call the Claims Office to inquire why plaintiff was being blamed for the bad checks, especially after he had told the clerk that the checks were not his. (Doc. No. 1, at 4.) On August 13, 2010, plaintiff met with defendant Shamany, a Northeast Revenue manager responsible for Luzerne County tax collection, to explain that he had not authorized the bad checks and to ask why no investigation was undertaken when he had previously denied writing or authorizing the checks. (Doc. No. 1, at 5.) Plaintiff also asked why the county had not contacted him or investigated the matter before releasing information about him to the Times Leader, (Doc. No. 1, at 5), and informed Shamany that the U.S. Secret Service was conducting an investigation into the incident. (Doc. No. 1, at 6.) Shamany assured plaintiff that there were safeguards to verify all checks, that any mistake would be the fault of Point and Pay, and that the problem was being investigated. (Doc. No. 1, at 6.)

On August 11, 2010, defendant Rodgers, also a Northeast Revenue employee, spoke to plaintiff about the bad check allegations and allegedly threatened plaintiff with criminal charges if he did not pay the remaining

$41,911 balance within ten days. (Doc. No. 1, at 6.) Plaintiff denied any involvement with the bounced checks and refused to pay any of the outstanding back taxes until the Secret Service had concluded their investigation. (Doc. No. 1, Att. 1.)

On March 15, 2011, plaintiff received a letter from the U.S. Attorney's office confirming that the account from which the bad checks were drawn was not an account owned by plaintiff. (Doc. No. 1, at 7.) In April 2011, Secret Service agent William Slavoski contacted plaintiff to inform him that the agency had determined that defendant Senchak had written the bad checks on plaintiff's behalf, allegedly without plaintiff's knowledge or authorization. (Doc. No. 1, at 7.) Plaintiff claims that, after the investigation, he paid the $41,911 in delinquent taxes, but Luzerne County allegedly continued to post tax sale notices on plaintiff's properties. (Doc. No. 1, at 7.)

Plaintiff commenced this action in the Luzerne County Court of Common Pleas on August 13, 2012, and defendants subsequently removed the matter to federal court. (Doc. No. 1.) Defendants Luzerne County, Northeast Revenue Services, John Rodgers, and Sean Shamany filed a motion to dismiss on January 2, 2013, (Doc. No. 2), and defendant Point and Pay filed a motion to dismiss on February 11, 2013. (Doc. No. 16.) Plaintiff

subsequently filed an amended complaint, (Doc. No. 49, 50), which added

RBA Professional Data Systems as a defendant but left unchanged plaintiff's

substantive claims against the moving defendants.

## STANDARD OF REVIEW

Defendants' motions to dismiss are brought pursuant to the provisions

of Fed. R. Civ. P. 12(b)(6). This rule provides for the dismissal of a complaint,

in whole or in part, if the plaintiff fails to state a claim upon which relief can be

granted. The moving party bears the burden of showing that no claim has

been stated, (Hedges v. United States, 404 F.3d 744, 750 (3d Cir.2005)), and

dismissal is appropriate only if, accepting all of the facts alleged in the

complaint as true, the plaintiff has failed to plead "enough facts to state a

claim to relief that is plausible on its face." Bell Atlantic Corp. v. Twombly, 550

U.S. 544, 127 S. Ct. 1955, 1974 (2007) (abrogating "no set of facts" language

found in Conley v. Gibson, 355 U.S. 41, 45-46 (1957)). The facts alleged must

be sufficient to "raise a right to relief above the speculative level." Twombly,

550 U.S. 544, 127 S. Ct. at 1965. This requirement "calls for enough fact[s]

to raise a reasonable expectation that discovery will reveal evidence of" the

necessary elements of the plaintiff's cause of action. Id. Furthermore, in order

to satisfy federal pleading requirements, the plaintiff must "provide the grounds of his entitlement to relief," which "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." Phillips v. County of Allegheny, 515 F.3d 224, 231 (3d Cir.2008) (brackets and quotation marks omitted) (quoting Twombly, 550 U.S. 544, 127 S. Ct. at 1964-65).

In considering a motion to dismiss, the court generally relies on the complaint, attached exhibits, and matters of public record. Sands v. McCormick, 502 F.3d 263 (3d Cir.2007). The court may also consider "undisputedly authentic document[s] that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the [attached] documents." Pension Benefit Guar. Corp. v. White Consol. Indus., 998 F.2d 1192, 1196 (3d Cir.1993). Moreover, "documents whose contents are alleged in the complaint and whose authenticity no party questions, but which are not physically attached to the pleading, may be considered." Pryor v. Nat'l Collegiate Athletic Ass'n, 288 F.3d 548, 560 (3d Cir.2002). However, the court may not rely on other parts of the record in determining a motion to dismiss. See Jordan v. Fox, Rothschild, O'Brien & Frankel, 20 F.3d 1250, 1261 (3d Cir.1994).

## DISCUSSION

## A.) NEGLIGENCE: COUNTS II & III

Plaintiff divides his negligence claims into two counts, but only refers to Count II, not Count III, as negligence. (Doc. No. 1.) Count III alleges alternative claims of misfeasance and malfeasance, but, because the court has determined that it is essentially a negligence action that has been improperly and unnecessarily brought as a separate claim, the court will address it in conjunction with Count II and treat it as a negligence claim. The court will first address Count II, which plaintiff has brought against Point and Pay and Northeast Revenue Services, and then address Count III, which plaintiff has brought against Rodgers, Shamany, and Northeast Revenue Services.

### 1.) Count II: Negligence

In Count II, plaintiff alleges that Northeast Revenue Services and Point and Pay had a duty to "ensur[e] the accuracy and veracity relating to the processing of online web real estate property tax payments made by taxpayers." (Doc. No. 1, at 9.) Plaintiff further claims that Northeast Revenue Services breached that duty by:

(a) failing to properly investigate and retain an online web processor that would have ensured that Senchak's alleged electronic check payments on Plaintiff's accounts were properly processed.

(b) failing to ensure that Senchak's alleged electronic check payments on Plaintiff's accounts were accurately and properly processed;

(c) failing to confirm, by its members/employees/agents, that Plaintiff's claims that he made on August 2, 2010 that he had not made these online payments were true;

(d) failing to have sufficient security, verification and validation safeguards and/or failing to require Point and Pay to have sufficient security, verification and validation safeguards, contrary to representations made on Point and Pay's website, to ensure that online property tax payment checks were authorized and genuine when made and made from existing bank accounts, with accurate and existing routing numbers attached to same;

(e) failing to timely and properly investigate the matter despite Plaintiff and Mary Tencza's denial of any online payments on August 2, 2010, before alleging to the Wilkes-Barre Times Leader and Plaintiff that Plaintiff had bounced the checks; and

(f) posting the above referenced tax sale notices on Plaintiff's real properties after Plaintiff had fully paid all delinquent property taxes on said properties. (Doc. No. 1, at 10-11.)

Plaintiff claims that Point and Pay breached its duty by:

(a) failing to ensure that Senchak's alleged electronic check payments on Plaintiff's accounts were accurately and properly processed;

(b) failing to have sufficient security, verification and validation safeguards to ensure that online property tax payment checks were authorized and genuine when made and made from existing bank accounts, with accurate and existing routing numbers attached to same, contrary to representation made on its website; and,

(c) failing to timely and properly investigate the matter in conjunction with Northeast Revenue, as set forth in Paragraph 18

above. (Doc. No. 1, at 10-11.)

*a.) Northeast Revenue Services*

Because this is a diversity case, the court applies the substantive law of the forum state, including the statute of limitations. Lafferty v. St. Riel, 495 F.3d 72, 76 (3d Cir. 2007). The statute of limitations for negligence claims is two years in Pennsylvania, and the time period begins to run when "the right to institute and maintain a suit arises." 42 Pa.C.S.A. §5524 (two year limitations period); Sakol v. Nationwide Mut. Ins. Co., 06-CV-0735, 2007 WL 1811215, \*4 (M.D.Pa. 2007) (statute begins to run when right to sue arises). The statute may be tolled, however, "[until] the Plaintiff has discovered his injury or, in the exercise of reasonable diligence, should have discovered his injury." Sanders v. County of Bradford, 11-CV-1723, 2013 WL 2435354, \*24 (M.D.Pa. 2013).

Defendant Northeast Revenue Services moves to dismiss plaintiff's negligence claims, arguing that they are barred by the statute of limitations. (Doc. No. 4, at 5-6.) In particular, they argue that plaintiff admits he had knowledge of all the relevant facts on August 2, 2010, two years and eleven days before plaintiff filed his lawsuit in state court. (Doc. No. 4, at 6.) Plaintiff admits the veracity of these dates but argues that he is only seeking damages

for the media coverage of the bad checks and mistaken tax sale postings, both of which he discovered on or after August 12.[1] (Doc. No. 10, at 10.) Therefore, he argues that the statute of limitations does not bar his claim insofar as it seeks damages for these incidences.

In its reply brief, defendant concedes that the claims relating to the posting of properties for tax sale and the Times Leader article fall within the statute of limitations and therefore escape dismissal at this stage. (Doc. No. 21, at 4.) Defendant further argues, however, that "plaintiff effectively waived his right to relief" for his other negligence claims by arguing that he is only seeking damages for those two events. (Doc. No. 21, at 4.) The court agrees that plaintiff has conceded that the statute of limitations bars all of his negligence claims except those related to the newspaper article and the allegedly mistaken tax sale notices. As such, defendant Northeast Revenue Services' motion to dismiss plaintiff's negligence claim will be **GRANTED IN PART** and **DENIED IN PART**.

*b.) Point and Pay*

---

[1]Plaintiff filed his claim on August 13, 2012, two years and one day after he discovered the media coverage of the bounced checks. Because August 12, 2012 was a Sunday, plaintiff properly filed within the two year period when he filed on the thirteenth.

Point and Pay moves for dismissal of plaintiff's negligence claims on the ground that Point and Pay did not owe him a duty and, even if it did, plaintiff has failed to plead sufficient facts to meet the pleading standards required by the federal rules. (Doc. No. 18.) Defendant further argues that, in the commercial realm, duties only arise by contract, not by tort, so plaintiff may not bring a negligence claim under these facts. (Doc. No. 18, at 5.) Defendant's position can be summed up by the conclusion of its brief:

> PNP maintains, however, that in a business setting, the scope of its duties must be defined by contract. Absent privity of contract, there can be no duty owed to the Plaintiff. The Plaintiff has failed to allege the existence of a contract with PNP, making Count II of its Complaint legally deficient, thereby justifying dismissal for failure to state a claim upon which relief can be granted. (Doc. No. 18, at 5.)

Plaintiff argues that he can establish a duty and, therefore, tort liability under the facts of this case. (Doc. No. 24.) He argues that, while there may, in fact, be an underlying contract, tort liability with a third party can arise independently of the contract. (Doc. No. 24.) Furthermore, he argues that the allegations in the complaint are sufficient to meeting the pleading standards necessary to make a *prima facie* case of duty. (Doc. No. 24.)

At the motion to dismiss stage, the moving party bears the burden of showing that the complaint has failed to state a claim for which relief can be

granted. [Calandrello v. Sentinel Ins. Co. Ltd., 13-CV-134, 2013 WL 2471630, *2 (M.D.Pa. 2013)](). Defendant makes several arguments which boil down to one common theme: "in a business setting, the scope of [the defendant's] duties must be defined by contract." (Doc. No. 18, at 5.) Defendant, however, fails to cite to caselaw standing for this proposition and does not define the ambiguous phrases "business setting" or "commercial transaction," both of which form the foundation for its argument that tort law does not apply to these facts. As such, defendant has failed, at this stage of the proceedings, to carry his burden of showing that plaintiff may only recover by establishing a contractual duty. Therefore, the court will **DENY** defendant Point and Pay's motion to dismiss.

As for the sufficiency of plaintiff's factual allegations, the court has determined that plaintiff has stated facts sufficient to raise a plausible inference of a negligence claim, one that discovery may substantiate. [Bell Atlantic Corporation v. Twombly, 550 U.S. 544 (2007)](); [Ashcroft v. Iqbal, 556 U.S. 662 (2009)](). Plaintiff argues that defendant had a duty to "ensur[e] the accuracy and veracity relating to the processing of online web real estate property tax payments made by taxpayers." (Doc. No. 1, at 9.) Next, he lists three ways that Point and Pay allegedly breached that duty:

(a) failing to ensure that Senchak's alleged electronic check payments on Plaintiff's accounts were accurately and properly processed;

(b) failing to have sufficient security, verification and validation safeguards to ensure that online property tax payment checks were authorized and genuine when made and made from existing bank accounts, with accurate and existing routing numbers attached to same, contrary to representations made on its website; and

(c) failing to timely and properly investigate the matter in conjunction with Northeast Revenue, as set forth in Paragraph 18 above. (Doc. No. 1, at 10.)

These allegations, along with the other facts set forth in the complaint are sufficient to raise a plausible claim for relief under a theory of negligence. Therefore, at this stage of the proceedings, the defendant has not shown that plaintiff has failed to state a claim for which relief can be granted, and its motion to dismiss the negligence claim against Point and Pay will be **DENIED**.

## 2.) Count III: Tortious Misfeasance/Malfeasance

As for the so-called malfeasance and misfeasance claims, defendants Shamany, Rodgers, and Northeast Revenue move for dismissal on the basis that Pennsylvania law does not recognize such a cause of action. (Doc. No. 4, at 6.) While the court is aware that Pennsylvania law does not recognize such a claim, it appears that plaintiff is merely using these words as synonyms for negligence and as a way to classify the particular types of negligence for which defendants are liable. According to Black's Law

Dictionary, malfeasance refers to "a wrongful or unlawful act," and misfeasance refers to "a lawful act performed in a wrongful manner." Black's Law Dictionary (9th ed. 2009).

Plaintiff alleges that defendants Rodgers, Shamany, and Northeast Revenue Services engaged in malfeasance and misfeasance by contacting the press and disclosing information about plaintiff's financial dealings with the county. (Doc. No. 1, at 11.) Notably, and in contrast to these claims, plaintiff's prior claim is one for negligence by way of failure to act when there was allegedly a duty to act. (Doc. No. 1, at 9.) Seen in this context, the court believes plaintiff used the terms misfeasance and malfeasance as a way to distinguish between Count II, which involved an alleged failure to act, and Count III, which involved an alleged wrongful act. Nonetheless, Count III is properly viewed as a negligence claim, a cause of action well-settled under Pennsylvania law.

Plaintiff's brief in opposition provides an alternative explanation for the use of the words misfeasance or malfeasance. Plaintiff appears to argue that he intended to allege a participation theory of liability against defendants Rodgers, Shamany and Northeast Revenue. (Doc. No. 10, at 10-13.) However, "[i]t is axiomatic that the complaint may not be amended by the

briefs in opposition to a motion to dismiss." [Heim v. York County Prison, 10-CV-1369, 2013 WL 1414638, *6, n. 7 (M.D.Pa. 2013)](#). The plain language of the complaint indicates that plaintiff intended to allege a negligence claim, so the court will construe Count III as a negligence claim, notwithstanding plaintiff's arguments to the contrary. Therefore, defendants' motion to dismiss Count III will be **DENIED**.

### C.) COUNT IV: EQUAL PROTECTION

In his complaint, plaintiff alleges that Northeast Revenue, Rodgers, Shamany, and Luzerne County violated the Equal Protection Clause of the Fourteenth Amendment by disclosing information to the press about the bad checks submitted as payment for plaintiff's delinquent taxes. (Doc. No. [1](#), at 12.) Plaintiff claims that he was treated differently than other similarly situated individuals because defendants did not disclose information about other taxpayers who also submitted bad checks during the same tax period. (Doc. No. [1](#), at 13.)

Although the complaint and accompanying briefs are somewhat ambiguous, plaintiff appears to raise claims under both the class-of-one theory and the selective-enforcement theory. Reading the complaint expansively, and, because defendants address both claims in their briefs,

(Doc. No. 4, at 7-14; Doc. No. 21, at 6-14), the court will consider both theories in turn.

### 1.) Class of One Theory

In order to make out a *prima facie* case under the class of one theory, a party must show "that he was intentionally treated differently from others similarly situated and that there was no rational basis for the difference in treatment." Perano v. Township of Tilden, 423 Fed. Appx. 234, 238 (3d Cir. 2011). "At the motion to dismiss stage, [the plaintiff] must allege facts sufficient to make plausible the existence of . . . similarly situated parties." Id. In this case, plaintiff alleges that defendants "selectively, intentionally and arbitrarily treat[ed] [p]laintiff differently compared with others similarly situated who purportedly submitted bounced checks . . . by advising the Wilkes-Barre Times Leader of the checks alleged to be bounced." (Doc. No. 1, at 13.) Essentially, plaintiff is arguing that six other taxpayers submitted bad checks but that he was the only one about whom information was disclosed to the press. (Doc. No. 1, at 6.) The court has determined that, at this stage in litigation, these allegations are sufficient to establish a *prima facie* case of similarly situated individuals and differential treatment. While the court is mindful that this case is a close call, the Supreme Court has explained that

a complaint need only "raise a reasonable expectation that discovery will reveal evidence of [a claim]." Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 556 (2007). Reading the complaint in the light most favorable to the non-moving party, as the court must, "the complaint's well-pleaded facts give rise to a plausible inference" that plaintiff was similarly situated to other taxpayers in all relevant aspects and was nonetheless treated differently. Ashcroft v. Iqbal, 556 U.S. 662, 682 (2009). Like plaintiff, other taxpayers allegedly bounced checks when paying their taxes, but plaintiff, unlike those taxpayers, was treated differently because the county shared information about him with the media.

Defendants attempt to distinguish plaintiff from other taxpayers by arguing that the press inquired about plaintiff's delinquent tax status during the period in question but did not ask about the other taxpayers who bounced checks with the county. (Doc. No. 4, at 10-11.) They contend that Luzerne County's policy was simply to respond to informational requests, so long as the information was not confidential. (Doc. No. 4, at 10-11.) Therefore, they argue, the county did not treat plaintiff differently; rather, the Times Leader did so by singling him out for inquiry about his tax status. Furthermore, defendants claim that plaintiff was not similarly situated with other taxpayers

that bounced checks because he was involved in a public corruption probe, (Doc. No. 4, at 11), and had previously pleaded guilty to misprision. (Doc. No. 1, at 3.)

The complaint and supporting documentation upon which defendants rely in arguing for dismissal are somewhat unclear as to whether defendants contacted the Times Leader or the Times Leader contacted defendants. (Doc. No. 1.) The complaint states that defendants "advis[ed] the Wilkes-Barre Times Leader of the checks alleged to be bounced by Plaintiff" and "communicat[ed] with the Wilkes-Barre Times Leader." (Doc. No. 1, at 13.) In further support of their position, defendants point to a newspaper article that the Times Leader requested information from defendants, but that article is also ambiguous. (Doc. No. 1, Exh. A.) It states, "[a]ccording to Northeast, Greco recently paid $66,577 toward the back taxes, in addition to the payments that did not clear." (Doc. No. 1, Exh. A.) Again, this does not indicate whether Northeast, a private contractor for Luzerne County, contacted the Times Leader or vice versa. Nonetheless, plaintiff alleges in his complaint that Luzerne County contacted the Times Leader, and this allegation is enough to survive a motion to dismiss.

Furthermore, even if plaintiff pleaded guilty to misprision of a felony and

was the subject of a public corruption probe, defendant fails to explain how this distinction is relevant to the decision to publicize information about plaintiff's financial status. Startzell v. City of Philadelphia, 533 F.3d 183, 203 (3d Cir. 2008) ("Persons are similarly situated under the Equal Protection Clause when they are alike in all relevant aspects"). As such, defendant has failed to demonstrate to the court that plaintiff was not similarly situated with the other taxpayers who bounced checks during the relevant period.

The second element of a class of one theory is intentional discrimination. Defendants argue that the only allegation going to show intent is paragraph fifty-three, which states, "[t]he aforesaid conduct of communicating with the Wilkes-Barre Times Leader was done with malicious and bad faith intent to injure Plaintiff and with the knowledge that Plaintiff would be injured as a result." (Doc. No. 4, at 12.) Defendants argue that this is a legal conclusion that the court should not consider in analyzing whether plaintiff properly pleaded intent. (Doc. No. 4, at 12.) Perhaps admitting that he cannot rely on this allegation alone, plaintiff responds by arguing that the discriminatory nature of defendants' conduct, especially when notified by plaintiff that something was wrong, creates a strong inference of intent to discriminate. (Doc. No. 10, 17-20.)

Federal pleading standards provide that a plaintiff must make a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2). The Supreme Court has interpreted this section to require enough facts to raise a plausible inference that a party has stated a claim which discovery will more fully substantiate. Bell Atlantic Corp. v. Twombly, 550 U.S. 544 (2007). The Third Circuit has said that a showing of intent must consist of more than allegations of "unequal treatment or adverse effect." Jewish Home of Eastern PA v. Centers for Medicare and Medicaid Services, 693 F.3d 359, 363 (3d Cir. 2012). Rather, a party must show that "the decisionmaker selected or reaffirmed a particular course of action at least in part because of, not merely in spite of, its adverse effects." Id.

Here, the complaint simply fails to provide facts sufficient to establish intentional discrimination. Even plaintiff's brief in opposition makes conclusory statements about intent:

> The Defendants did not provide information to the media regarding the other individuals who in fact bounced their checks at said time, but rather provided information about the Plaintiff setting forth he did in fact bounce checks when Defendants knew or should have known the information was false. Said conduct evidences the Defendants acted intentionally and in a discriminatory manner towards Plaintiff, to his detriment. (Doc. No. 10, at 20.)

> This statement equates unequal treatment with purposeful

discrimination, but that kind of logic has been rejected in the Third Circuit. Id.

Plaintiff explains that, because Northeast was put on notice that the checks were fraudulent, it had a duty to investigate and the failure to do so shows intent to discriminate. (Doc. No. 10, at 19.) These facts indicate that Northeast failed to investigate, perhaps even intentionally, a serious breach of security. They do not, however, raise a plausible inference of intent to discriminate, the operative inquiry for purposes of a class-of-one claim. While these facts suggest that something went wrong at Northeast Revenue, plaintiff has provided no evidence at all that these actions were intentional or discriminatory in nature.

The third element of a class-of-one theory is the rational basis inquiry, which asks whether the government had a rational reason for the differential treatment. Defendants argue that their actions were rational because the information released by the county merely "confirm[ed] a matter of public record when asked by the newspaper." (Doc. No. 4, at 14.) Defendants further argue that "[p]laintiff fails to negative any reasonably conceivable state of facts that could provide a rational basis for any purported differing treatment." (Doc. No. 4, at 14.) In response, plaintiff relies largely on his complaint, explaining that his averments "substantiate the irrational actions of the

[d]efendants aimed solely at the [p]laintiff and the fact that said actions do not and can not serve any legitimate governmental purpose." Finally, defendants essentially argue that the rational basis standard's deferential review requires the court to take all allegations in the complaint as true but to apply these facts in a deferential light to the government. (Doc. No. 10, at 22.)

The court recognizes the incongruity between the standard for a motion to dismiss and the standard governing rational basis review. The Middle District, however, has recognized the primacy of the motion to dismiss standard at this stage of trial:

> On one hand the Court is considering a motion to dismiss, meaning that all inferences must be drawn in favor of the non-movant and dismissal is appropriate only if, as discussed above, the Plaintiff has failed to provide factual allegations with the heft to raise the complaint beyond the speculative level. On the other hand, Defendant may not be held liable under Plaintiff's class-of-one claim unless there is no conceivable rational relationship between the differential treatment and a legitimate governmental interest. Applying the 12(b)(6) standard, every benefit of the doubt goes to Plaintiff, but applying rational basis review, the Court must grant great deference to Defendant.
>
> The rational basis standard, of course, cannot defeat the plaintiff's benefit of the broad Rule 12(b)(6) standard. The latter standard is procedural, and simply allows the plaintiff to progress beyond the pleadings and obtain discovery, while the rational basis standard is the substantive burden that the plaintiff will ultimately have to meet to prevail on an equal protection claim. Brace v. County of Luzerne, 873 F.Supp.2d 616, 630 (M.D.Pa. 2012) (quoting Wroblewski v. City of Washburn, 965 F.2d 452, 460 (7th

Cir. 1992)); [Good v. Trish, 06-CV-1736, 2007 WL 2702924, \*7 (M.D.Pa. 2007)](#).

In light of the above, the court must now determine whether plaintiff has pleaded sufficient facts to raise a plausible inference that defendants lacked a rational basis when they communicated to the Times Leader that plaintiff allegedly had passed several bad checks in payment of his delinquent taxes. Plaintiff states in his complaint, "[t]here is no rational basis for the difference in treatment of [p]laintiff, based upon unjustifiable and arbitrary standards, as alleged herein." (Doc. No. 1, at 13.) Based on the factual allegations of the complaint, the court can conceive of no rational basis for disclosing information concerning the payment of plaintiff's property taxes to the press and, ultimately, the general public. [English v. Board of Education of Town of Boonton, 301 F.3d 69, 76 (3d Cir. 2002)](#).

Defendants argue that they had a rational basis because "[defendants] did nothing more than confirm a matter of public record when asked by the newspaper." (Doc. No. 4, at 14.) While the court agrees that it was public information that plaintiff was late on paying his taxes, defendants have provided no evidence and plaintiff has not alleged that the information about the bounced checks was public information. Therefore, defendants' proffered reason is unsupported by the complaint's allegations and the record. As such,

plaintiff has met his burden of pleading lack of rational basis at this stage.

However, although plaintiff has sufficiently pleaded the elements of differential treatment and rational basis, he has failed to properly plead intentional discrimination. Because it is possible that this error may be corrected, the court will **GRANT PLAINTIFF LEAVE TO AMEND** his complaint.

### 2.) Selective Enforcement

In order to allege a selective enforcement claim, a party must show "discriminatory enforcement of a facially valid law." Hill v. City of Scranton, 411 F.3d 118, 125 (3d Cir. 2005). Plaintiff's complaint merely contends that he was treated differently than other taxpayers, not that a law, rule, or even unofficial policy was applied to him differently than others. (Doc. No. 1.) Because it is possible that this error may be corrected, the court will **GRANT PLAINTIFF LEAVE TO AMEND** his complaint.

### D.) MUNICIPAL LIABILITY

In his complaint, plaintiff brings an equal protection claim against defendant Luzerne County pursuant to 42 U.S.C. §1983. (Doc. No. 1, at 12.) Defendants move to dismiss this claim on the ground that plaintiff has failed to plead that the alleged wrongdoing was conducted pursuant to an official

policy or custom as required by *Monell*. (Doc. No. 4, at 17-20.) Plaintiff responds by arguing that the nature of the conduct itself gives rise to the inference that Luzerne County maintained an unconstitutional policy or custom. (Doc. No. 10, at 28.)

Monell liability stems from 42 U.S.C. §1983, which provides:

> Every person who, under color of any statute, ordinance, regulation . . . subjects or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . 28 U.S.C. §1983.

A municipality is a "person" for purposes of §1983, but courts have declined to find municipal liability under a theory of *respondeat superior*. Bd. of the County Comm'rs of Bryan County, Oklahoma v. Brown, 520 U.S. 397, 403 (1997) (citing Monell v. New York City Dept. of Social Services, 436 U.S. 658, 689 (1978)). A municipality is not liable under §1983 merely for employing someone who violates a person's civil rights, only where it has in place a policy or custom that led to the violation. Id. There are three times when a municipality may be held liable for the acts of its employees:

> First, the municipality will be liable if its employee acted pursuant to a formal government policy or a standard operating procedure long accepted within the government entity; second, liability will attach when the individual has policy making authority rendering

his or her behavior an act of official government policy; third, the municipality will be liable if an official with authority has ratified the unconstitutional actions of a subordinate, rendering such behavior official for liability purposes. McGreevy v. Stoup, 413 F.3d 359, 367 (3d Cir. 2005).

Policy and custom have been defined as follows:

Policy is made when a decisionmaker possessing final authority to establish municipal policy with respect to the action issues an official proclamation, policy, or edict. A course of conduct is considered to be a custom when, though not authorized by law, such practices of state officials are so permanent and well-settled as to virtually constitute law. Custom may also be established by evidence of knowledge and acquiescence. Mulholland v. Government County of Berks, 706 F.3d 227, 237 (3d Cir. 2013).

Plaintiff argues that the actions of defendants Rodgers and Shamany amounted to both policy and custom, so the court will consider both in turn. (Doc. No. 1, at 13.)

The question of whether an individual has final policy-making power is a question of state law. McMillian v. Monroe County, 520 U.S. 781, 786 (1997). In Pennsylvania, "only a majority of the three-member Board is authorized to establish policy on behalf of the County." LaVerdure v. County of Montgomery, 324 F.3d 123, 125 (2003) (citing 16 Pa.C.S.A. §504). Here, plaintiff merely states that defendants Rodgers and Shamany are the president and manager, respectively, of Northeast Revenue, a company acting as a collection agent and independent contractor for Luzerne County.

(Doc. No. 1, at 1-2.) Plaintiff has not alleged that Rodgers and Shamany were board members nor has he alleged any facts creating any inference that they had any influence whatsoever on county policy. Therefore, plaintiff has failed to show *Monell* liability by showing a government policy.

As for custom, "a course of conduct is considered to be a custom when, though not authorized by law, such practices of state officials are so permanent and well-settled as to virtually constitute law." [Mulholland v. Government County of Berks, Pa., 706 F.3d 227, 237 (3d Cir. 2013)](). "Custom may also be established by evidence of knowledge and acquiescence." Id. Furthermore, "[a] custom under *Monell* can usually not be established by a one-time occurrence." [Solomon v. Philadelphia Housing Authority, 143 Fed.Appx. 447, 457 (3d Cir. 2005)](). Here, plaintiff cites only one incident, an incident he contends amounts to custom, but he cites no other incidences from which the court could infer a custom. (Doc. No. 1, at 13-14.) Therefore, plaintiff's claim for municipal liability under *Monell* fails. In light of the foregoing, the municipal liability claim will be **DISMISSED**.

## E. QUALIFIED IMMUNITY

Finally, defendants claim that Rodgers and Shamany are entitled to qualified immunity because they were public contractors for Luzerne County.

(Doc. No. 4, 14-16.) The Supreme Court has said that the application of qualified immunity depends on, "(1) whether the official's conduct violated a constitutional or federal right; and (2) whether the right at issue was clearly established." Sharp v. Johnson, 669 F.3d 144, 159 (3d Cir. 2012). "A right is clearly established for qualified immunity purposes where its contours are sufficiently clear that a reasonable official would understand that what he is doing violates that right." Id. This prong requires an inquiry into whether there was "sufficient precedent at the time of the action, factually similar to the plaintiff's allegations, to put [the] defendant on notice that his or her conduct is constitutionally prohibited." Wilson v. Zielke, 382 Fed. Appx. 151, 152 (3d Cir. 2010). Qualified immunity extends to private contractors working for government entities. Filarsky v. Delia, 132 S.Ct. 1657, 1665-67 (2012).

At this stage in the litigation, defendants have simply failed to establish the applicability of qualified immunity. Without citing any case law to indicate whether or not there was sufficient precedent on point at the time of the alleged equal protection violations, they merely conclude:

> Assuming *arguendo*, that Plaintiff was subject to a Fourteenth Amendment Equal Protection violation . . . the question presented here is whether there was sufficient precedent at the time of Plaintiff's termination, factually similar to Plaintiff's allegations, to put Moving Defendants on notice that confirming to a newspaper a matter of public record would be in violation of that individual's

Fourteenth Amendment rights. Based on the analysis above, it is clear that a reasonable official would not understand that the actions at issue here would violate Plaintiff's constitutional rights and, therefore individual Defendants Mr. Rogers and Mr. Shamany are immune from suit. (Doc. No. 4, at 16.)

Furthermore, defendants once again argue that the information disclosed to the Times Leader was public information. They further argue that plaintiff can allege no clearly established right because merely confirming a matter of public record cannot be a constitutional violation. (Doc. No. 4, at 16.) Again, defendants fail to distinguish between the posting of plaintiff's tax sale notices and the information about the bounced checks. Plaintiff admits that the former was public, but not the latter, and defendants have failed to convince the court otherwise. Therefore, because defendants fail to establish that the right at issue was clearly established or, for that matter, define what exactly the right would be in this case, the court will **DENY** defendants' request for application of qualified immunity at this stage of the proceedings.

An appropriate order will follow.


s/ *Malachy E. Mannion*
**MALACHY E. MANNION**
**United States District Judge**

**Dated:  August 26, 2013**
O:\Mannion\shared\MEMORANDA - DJ\2012 MEMORANDA\12-2576-01.wpd